The next case is People v. Carl Darnell. Mr. Welch, when you're ready, would you please approach and begin. May I introduce the court? Yes, sir. My name is Larry Welch. I represent the defendant, Carl Darnell. Mr. Darnell was convicted of helping to make methamphetamine at his house in West Franklin. He raises several issues before this court, but unless there are questions, I'm going to confine my presentation today to the reasonable doubt issues. The state's case against Mr. Darnell is incredibly poor and incredibly weak. Only one witness testified that Mr. Darnell helped make methamphetamine at his house. And that witness, while still on the stand, repudiated her testimony. The state's theory of the case was that Mr. Darnell was combining with his son, Lucky Vidal, his son's friend, Ian Morgan, and this juvenile, J.S., to make methamphetamine for a week, ten days, something like that, before the police came upon the house and caught them at it red-handed. But there is overwhelming evidence to contradict the state's theory. Mr. Darnell was a working man. He was on the job. His boss, his wife, his friends, his family, they testified that he was not using drugs, but he was working. He and his wife had to leave the house because there was only one bathroom in the house and it was broken down. The floor was rotted out. There was raw sewage. Mr. Darnell paid his son and Ian Morgan $200 to fix the bathroom. The rest of the family moved away to Grandma Darnell's house. They stayed with her. Lucky and Morgan used the $200, but they didn't use it to fix the bathroom. They used it to purchase materials to make methamphetamine, using this house as a base while the Darnells were gone. Now, these people, Lucky, Morgan, and J.S., they were the ones that handled all this material. They handled these bags, cans, plastic sleeves, the pill bottles, the jars, the cartons, the hoses, all these things. The state has no evidence that Mr. Darnell's fingerprints are on any of this material. The state destroys this evidence. The state has no evidence. The only testimony that they have that Mr. Darnell helped make this methamphetamine was repudiated on the witness stand. And besides that, it's contradicted by a number of witnesses. Lucky and Morgan, for example, they took the stand and testified that they alone, with J.S.'s help, made the methamphetamine. Mr. Darnell didn't know anything about it. Rodney McPherson testified for the defense that Mr. Darnell and his family were living at Mr. Darnell's mother over the three crucial days. When the state said he was at the house cooking meth, where this live meth took place, and it was supposed to be going on. Mr. McPherson was around Mr. Darnell a lot during that time. He saw no sign of meth use or meth making. Terry Sleena testified for the defense that he saw Mr. Darnell at least three or four times a week during this period of time. And he knew that Mr. Darnell and his family were living with Mr. Darnell's mother while Mr. Darnell was having his bathroom fixed. Mr. Darnell only went back to the house to get clothes. When Fleena was at the Darnell house, he smelled no ammonia. He saw no meth making. Fleena testified that Mr. Darnell was not involved with methamphetamine, that Lucky and J.S. took the house over while Mr. Darnell and his wife and children were gone. Mr. Darnell's wife testified that she and her husband and children lived at her mother-in-law's house temporarily while the bathroom was being fixed. Her husband never made meth, he never used meth, and he was arrested when he stopped back by the house to check on the progress of the bathroom repairs. Philip Logdon, Mr. Darnell's boss, testified that he and Mr. Darnell were hard at work at a very physical job, tearing down a garage for several days, the same crucial three or four days that Mr. Darnell, according to J.S.'s initial testimony, was high on methamphetamine all the time and making more and staying at that house. Logdon was with Mr. Darnell over this period of time. He would have noticed if he was on methamphetamine. He knows he wasn't on methamphetamine, he was working. He wasn't using meth. And J.S., of course, retracted her testimony. Mr. Logdon stuck by his. Christy Schindler, Mr. Darnell's daughter, testified that J.S. was living at her grandmother's house while the bathroom was being repaired. Helen Darnell, Mr. Darnell's mother, testified that Mr. Darnell was working all day with Philip Logdon on the days in question and stayed with her while his bathroom was being repaired. Mr. Darnell took the stand in his own defense, and he denied any involvement with Bible and mortgage methamphetamine operations. They used his house, with his permission, for the purpose of repairing the bathroom. He didn't know anything about this methamphetamine. He was completely surprised to learn that there was any methamphetamine going on. Now, Mr. Darnell has no prior to speaking. The most serious crime in his background is a Class A misdemeanor. This man is 45 years old, hard-working family man. He should not be left in prison over a case like this. There's no fingerprints connecting to this crime. The only testimony connecting to the crime is repudiation. This case is too weak to stand. We'd ask this court to reverse its conviction for lack of evidence. Okay. Thank you. Ms. Shanahan. May it please the court, counsel, my name is Sharon Shanahan, and I represent the people of the state of Illinois. Defendant's argument would make a great deal of sense if you believe only the defendant's friends and family, and disregard the evidence that the state presented, and which the fact finder accepted, that clearly established Mr. Darnell's complicity in the crime he was charged with. I want to make sure that we understand what that crime was. It wasn't using drugs. It doesn't matter whether he was using drugs. So therefore, whether his boss is working with him during the day and says that he wasn't using drugs, that doesn't matter. What he's charged with is making meth, not using it. There is no doubt that meth was being made at the defendant's house. This was the house that he owned, and I think that's a significant fact that we need to take into consideration that there is considerable case law out there that says that there's a presumption that if you are in control of a home, then the drugs found in it are presumably yours, and that's definitely the case here. This was his case. I think another thing I need to point out right now is that there was so much stuff found in this house. I mean, there is a CD that's got dozens of pictures of the materials found in the home. When you take all of this, and much of it reasonably related to the manufacturing meth, when you take all of those pictures and look at everything that was found, and then you come down to the picture that the state has included in the appendix of our brief and say, out of all of that stuff, this is what we destroyed. I mean, it's a handful. Let's back up. They destroyed all that that was in the picture? They destroyed what was in the picture. And everything in the picture had the potential for blowing up or something like that? They destroyed everything in the picture. The police called the... Hazmat. Yes. Okay, well, my question is, I don't understand. Why don't they print this stuff? Like, can a beaker blow up if it's empty? Or a piece of plastic tubing? Why don't they split that and just put a piece of tape on it and sprinkle the dust on it and put tape on it and get it print? That'll find out who's been messing with this. They don't do it. In this case, there was nothing done to tie... There was nothing done to the materials that were destroyed. Okay, now, was there a beaker in there of some kind? There's some mason jars. Okay, and that was not printed? No. Why would they blow up, or why would they be dangerous? I don't make math, and I don't belong. Okay, so you're saying you don't know, so... What I am saying is that, first of all, there was nothing raised below as to why were these destroyed. So I don't know that that's the question that you're answering for this court. Second of all, there was lots and lots of similar other stuff. What the defendant is saying is maybe Lefty and Ian's fingerprints were on the mason jar and mine weren't. The same argument could have been made for all of the other materials that were found in the house that were not destroyed, that could have been tested. I mean, and there was a lot... Oh, I thought it was all destroyed. No, that's my whole point. No, there are only... I think we'll all agree that the three propane tanks that were altered certainly needed to be destroyed. The rubber hose that had its fittings altered and was probably, according to the expert testimony, Mona used to drain the anhydrous ammonia from the nurse tank was destroyed. The Coleman fuel and... Walmart, sitting on a shelf. But how do we... I mean, this is somebody that's making meth. This is used in the process. What it amounts to is you're asking them to test before they test. In McCarthy, the government... I mean, the Supreme Court said very vehemently that everything used to make meth is dangerous. Even the statute that deals with... When they made meth its own special statute, the Supreme Court... I mean, the legislature pointed out that this is an extremely dangerous procedure to make it. And so that's why it's in its own statute. That's why it's treated differently. That's why McCarthy says you can throw away all but a little sample of it. Most of what's in that little sample is not... I mean, there were arguments made prior to McCarthy that the state should be required to essentially finish the cooking process. I'm going to ask you. What I'm getting at is wouldn't it be easier to make a case if you had prints on all of it? Well, why not print all the other things that were left? I mean, there was a lot. The same... But they didn't. No. Defendant didn't either. Nobody did. I mean, if he's saying he's harmed, he could have made... The point that the defendant wants to make is if my fingerprints were not on that stuff, then obviously I wasn't there. He can make the same point with all the other stuff that he did have access to, and there was a lot. I mean, there was no... There was a hand... He's still saying he never had access to that. He never knew about it, I think, in this case. Okay. That's what he's saying. So one way to prove he did know about it was if he had his prints on it. He was seen... Let's back up a little bit as far as whether he was there. First of all, J.S., the juvenile in the case, was not the only person that put the defendant at the scene at the time the meth was being made. In fact, Stephen Burns was at the defendant's house when the police arrived. He'd been there for a little while, and when he got there, he saw the defendant coming out of the front door of his house. The defendant says, I couldn't have gotten into the front door of my house. It was, I couldn't have gotten into my house. It was locked. Well, he was seen coming out of his house. Second of all, he even admitted that the back door was locked, but he knew how to get in without a key. So there's another way he can get out. He also admits that he was in the garage. This is the garage where the meth solution was found. He said he was there that day. The propane tanks were leaning up against the garage. So he's seen in the house. He admits being in the garage where the meth solution is, where the propane tanks are leaning up against the side. You're talking about the exterior side of the garage? The meth solution was inside the garage. But the tanks? Tanks were leaning up against the side. And how big are the tanks? Like to use for propane gas. Oh, okay. I'd like to also go back to the testimony of J.S. No, I don't. Before I get there, I want to finish the other people. Ashley Primaster was at the defendant's house the night before for three hours. And the whole three hours she was there, the defendant was there. J.S.'s mother was there just a couple of days before you. Don't make meth in an hour. This is a prolonged procedure, which they estimate took three days. Here's another thing that I think is extremely important. The defendant and his mother, his mother who I'm sure would do anything she could to help him have her son, says after he got home from work about 3 o'clock, and the defendant said the same thing, took a shower, and I took him over to the house and dropped him off. The police first arrived at the defendant's house at 7 o'clock in the evening. So even from the testimony of the defendant, even from the testimony of his mother, the defendant was there for three hours before the police arrived. This is contrary to what his friend says now. In the reply brief, the defendant says, oh, well, maybe the police wrote it down wrong. Well, that's not the kind, I mean, police are in the business of making accurate records. They didn't make a three-hour mistake. And so even under the testimony of the defendant's witnesses, he had three hours, he was at that house while the meth is definitely being made that day. Was J.S. offered any kind of deal? J.S. was under juvenile for not, for running away from her foster parents, and I believe for the, but there's no indication she was offered a deal. I think one thing we need to remember about J.S., she certainly didn't want to be on the stand. There's no doubt about that. But to say that she's not credible pretty much lies in the face of the evidence. And, in fact, in denying the post-trial motion, the trial court specifically said that she was credible and reliable. So she was subpoenaed? J.S. was subpoenaed?  I'll ask Mr. Swell as well. Thank you. Can I have just one thing? Sure. I want to apologize to the court and Mr. Wells for inadvertently overlooking a case that he cited, People v. Escalante, and I just wanted to note that that case is not an ineffective assistance of counsel case. It is a case dealing with a motion to suppress, which is what I have said all along is what should have, could have been done in this case, but it was not because of trial. Rebuttal. Could you tell me under what circumstances J.S. testified? Yes, she was in custody. She was in custody at the time that she was brought in and written. And the picture, I'm really thankful for the state that included the picture of the material in the back of it. And that's? That's the photograph. Where was that taken, in the house? No, the officers who gathered the material together that they believed would convict my client. This is the material that they thought, the state believed amounted to the meth making material. But I mean, was that staged or? Oh, yes, yes, that's right. The yellow pack came from the floor of the living room. This bag over here came from the kitchen. The material that's piled together in the front came from under the sink. This coal and fuel, I believe, was in the garage. And the glass jars were in the garage. The drain thing was under the sink. And the big tents were outside. So they took the picnic table that was close by and they piled all the stuff around there. And they called this the trophy shop. And the trophy shop was all the stuff they took away to be destroyed. Now, whatever else it means, it certainly means that the defendant gets the benefit of those, what those materials would rationally show would be that he could check such as fingerprints. We should presume Mr. Darnell's fingerprints are not on this and J.S. and Morgan and Bible's prints are on them. That's what you get when you destroy real evidence like this for no reason. And the appropriate case is cited in the reply brief. It's the Gallagher case. In the Gallagher case, what happened was there was a thermos that had a meth cook in it that was highly explosive. And the defendant complained that he wanted to have the material in the container safe. And the evidence there was that in order to safely maintain this material, so it wouldn't evaporate or blow up on a thing, you'd have to have it stored at 20 degrees below zero or something ridiculous like that. And the court just said, we're not going to make this thing. No, we're not going to do that. But what's happened since then is that the state has just hired these hazmat people to come in and just destroy everything willy-nilly, whether it's dangerous or not. And you can take a look at these things and see that they're not dangerous. They're not going to blow up. They're not like this highly explosive cook material that was present in the Gallagher case. And we just shouldn't let the state destroy these things without having some consequences. Having them destroyed like this. And I think the rational consequence is to use the doctrine of exfoliation, give the defendant the benefit of those inferences that would be in his favor if he had this material. Ms. Shanahan says that there were a lot of other items that could have been, I guess, dusted. Well, these are the ones that they picked. These are the ones that the police officers picked. These are the ones that the state says connects the defendant. And they were all destroyed. And they were all destroyed. And that's the only ones that we are interested in. Which ones are you guys picking out? Okay, we want to test that. And we can't. Because they destroyed it for no reason. Now, it's important to remember that J.S. testified that the defendant was there all the time, and he was high all the time, and he was making drugs all the time. That's what she testified. So the idea that he was told that he wasn't charged with using drugs, what's that got to do with it? Well, she testified he was there, high, making drugs, using drugs the whole time. So it obviously contradicts her to have a whole string of people saying he was a working man, on the job, and sober. Because it directly contradicts her. And remember, she repudiated her testimony. She retracted it. So we only have retracted testimony. The only testimony that he's guilty of is retracted. And there's a whole string of people who testified that he couldn't have continued to do that. It has to do with this commission. Okay. Thanks to both of you for your arguments and briefs this morning, and we'll take the matter under advisement.